IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

SHERRY SOUTHER,

    Plaintiff,

vs.                                                    Civil No. 96-1129 SC/WWD

KENNETH S. APFEL, Commissioner
of Social Security,[1]

    Defendant.

## MAGISTRATE JUDGE'S PROPOSED FINDINGS
## AND RECOMMENDED DISPOSITION
### Proposed Findings

1. This matter comes before the Court upon plaintiff's Motion to Reverse and Remand for a Rehearing, filed August 13, 1997 [7-1]. The Commissioner denied plaintiff's request for Social Security Disability Insurance and Supplemental Security Income benefits. Plaintiff, age 36, alleges a disability since May 15, 1993 due to hepatitis-C and migraine headaches. Plaintiff has worked in the past as a receptionist and secretary. She has a high school education and has also received training as a nurse's aide.

2. After conducting an administrative hearing, the Commissioner's Administrative Law Judge ("ALJ") denied plaintiff's applications, concluding that Ms. Souther has the residual functional capacity to perform light work with certain positional limitations and could perform

---

[1] President Clinton appointed Kenneth S. Apfel Commissioner of Social Security as of August 29, 1997. Pursuant to Rule 25(d)(1) of the Federal Rules of Civil Procedure, Kenneth S. Apfel should be substituted for Shirley Chater as the Commissioner of Social Security, who was the appropriate party at the time of the underlying decision. No further action need be taken to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

past relevant work as a receptionist and secretary. The Appeals Council declined to review Ms. Souther's request for review of the ALJ's decision, thus the ALJ's decision is the final decision of the Commissioner. Plaintiff now seeks review of that final decision pursuant to 42 U.S.C. §405(g).

    3.   The standard of review in social security appeals is whether the Commissioner's final decision, in this case the ALJ's decision, is supported by substantial evidence. <u>Thompson v. Sullivan</u>, 987 F.2d 1482, 1487 (10th Cir. 1993)(citations omitted). Additionally, the Commissioner's final decision can be reversed if the ALJ failed to apply the correct legal tests. <u>Id.</u> (citation omitted).

    4.   Plaintiff raises the following allegations of error with respect to the ALJ's decision: (1) the ALJ applied the wrong legal standard in the finding that plaintiff's impairments, singly or in combination, did not meet or equal in severity a listed impairment; (2) the ALJ's finding that plaintiff can perform past relevant work as a receptionist and secretary was not based on substantial evidence and incorrectly applied the law in that the ALJ did not take into account the side effects of plaintiff's medications as a nonexertional impairment; (3) the ALJ erred by not obtaining the testimony of a vocational expert in determining plaintiff's residual functional capacity.

    5.   "To qualify for disability benefits, a claimant must establish a severe physical or mental impairment expected to result in death or last for a continuous period of twelve months which prevents the claimant from engaging in substantial gainful activity." <u>Thompson</u> at 1486 (citing 42 U.S.C. §§ 423 (d)(1)(A) and 1382c(a)(3)(A)). Social Security Regulations require the Commissioner to evaluate five factors in a specific sequence in analyzing disability applications.

Id.; see 20 C.F.R. §§ 404.1520(a - f); 416.920.  The sequential evaluation process ends if at any step the Commissioner finds that the claimant is disabled or not disabled.  Id. (citations omitted).

**First Alleged Error**

6.   Plaintiff first alleges that the ALJ applied the wrong legal standard in the finding that plaintiff's impairments, singly or in combination, did not meet or equal in severity a listed impairment.  The Commissioner must consider all impairments in combination when deciding the severity of claimant's impairments even if those impairments, if considered separately, would not be severe.  20 C.F.R. §§ 404.1523; 416.923.  Hargis v. Sullivan, 945 F.2d 1482, 1491 (10th Cir. 1991).

7.   Plaintiff contends that the ALJ ignored her other impairments, which in combination would equal a listed impairment.  In addition to migraine headaches, the ALJ considered plaintiff's mild chronic type C hepatitis.  Tr. at 16.  The other impairments were not supported by the record such that the ALJ should have considered them.  SSR 96-5P (the requirements of listed impairments are objective, and whether an individual's impairment manifests these requirements is simply a matter of documentation).

8.   For example, about three times a year, Ms. Souther develops a desquamating rash which begins on her trunk and spreads to her extremities.  The condition is both relieved and resolved with steroidal treatment.  Tr. at 115, 122, 178, 243.  Plaintiff's "possible depression" was documented in connection with the frustration surrounding her very frequent migraine events. Tr. at 136.  The headaches were causing financial and family stress.  Tr. at 91, 106 ("not particularly depressed-sounding, although clearly is anxious . . . about financial aspects of not working. . . .").  Plaintiff was treated with anti-depressants (Tr. at 232, 234) for her migraines, not

3

depression. Tr. at 106, 243. Except for plaintiff's chronic hepatitis, these other impairments were not of significance in the record such as to warrant consideration by the ALJ.

    9. The ALJ specifically considered Ms. Souther's hepatitis. Tr. at 16. Plaintiff had liver function studies done while hospitalized in 1993 in connection with her headaches and was seen by a gastroenterologist, Dr. Paul Pierce. Dr. Pierce noted that her "primary problem" was her "intractable migraine headaches." Tr. at 120. Plaintiff was found to have elevated liver function enzymes, and a hepatitis panel which showed positive for type C antibodies. Ms. Souther had no clinical manifestations of the acute stages of the disease. Id. A subsequently performed liver biopsy revealed very mild type C hepatitis. Tr. at 16.

    10. Medical equivalence to determine whether a combination of impairments is medically equal to any listed impairment must be based on medical findings. 20 C.F.R. §§ 404.1526; 416.926. Given the paucity and weakness of the medical findings associated with Ms. Souther's impairments except for her migraines, I find that the ALJ did not err in finding that even in combination, Ms. Souther's impairments did not render her disabled at Step Two.

**Second and Third Alleged Errors**

    11. Plaintiff next argues that the ALJ should have taken into account the side effects of plaintiff's medications as a nonexertional impairment, and also that a vocational expert should have been consulted in determining Ms. Souther's residual functional capacity. I consider these allegations together, since I find that they are both marked by the same error committed by the ALJ, i.e. a factually and legally erroneous determination regarding plaintiff's nonexertional impairments.

    12. The ALJ's reliance on the objective medical evidence in the record (such as

4

nonremarkable findings from sensory, motor and neurological examinations, Tr. at 16, 17) used to discount the severity of plaintiff's symptoms was legally incorrect. Although the ALJ may discount significance of pain or nonexertional symptoms when there is a lack of objective corroborative evidence, Diaz v. Sec'y of HHS, 898 F.2d 774, 777 (10th Cir. 1990), the ALJ was not justified in doing so here. There is no "dipstick" test specific to migraine headaches. See Guinn v. Chater, unpubl. op., 83 F.3d 431, 1996 WL 211140 at *2 (10th Cir.); Federman v. Chater, unpubl. op., 1996 WL 107291 (S.D.N.Y. 1996). Rather, a diagnosis is derived from the clinical picture, including history and symptoms. See Sisco v. United States Dep't of Health & Human Servs., 10 F.3d 739, 743 (10th Cir.1993).[2]

13. A review of plaintiff's headache history and treatment reveals a clinical picture that is consistent with her complaints of disabling headaches. The ALJ ignored the way her medical history and treatment tracked her complaints. Talley v. Sullivan, 908 F.2d 585, 587 (10th Cir. 1990) (the medical records must be consistent with the nonmedical testimony as to the severity of the pain).

14. Ms. Souther had suffered from migraine headaches once or twice a year (Tr. at 242), but around 1988, they increased to about once or twice a month (Tr. at 106),[3] and in 1992, increased yet again to a point where in the latter part of 1993, she was experiencing intractable

---

[2] As a point of observation, the ALJ's approach dooms a migraine sufferer from the start, regardless of how severely the symptoms cut into the individual's ability to function at even a minimal level, simply because no objective medical evidence (i.e., signs or laboratory findings) is connected with migraines. See § 404.1528(b),(c).
.

[3] Plaintiff fell off a motorcycle in 1981, sustaining injury to her head and jaw which required stitches. Tr. at 215, 289.

headaches almost two to three times a week, sometimes three to four times a week. Tr. at 106, 114. They last on average about 24 hours. Two to three times a month, plaintiff has to visit the emergency room for intravenous narcotics in an effort to abort the attack. Tr. at 243. Both a treating physician, Dr. Simson, and an oral surgeon, noted that she had her braces removed around the time the headaches grew worse. Tr. at 106, 242.

15. She reports that the headaches usually start with a visual prodrome, Tr. at 242, progressing to "ice-pick" pain (Tr. at 243) behind the left eye, temple, jaw and teeth and spreading down to the left side of her torso. During the attacks, she has nausea which is frequently accompanied by vomiting, and is sensitive to light, noise and sound. Tr. at 216, 106-07, 243. Her mother had the same type of headaches. Tr. at 243.

16. Ms. Souther made the rounds to various doctors and specialists. Over the course of treatment, Ms. Souther tried nearly every kind of medication regimen included in the arsenal of migraine treatment, including but not limited to vasoconstrictors, narcotics, barbiturate compounds, calcium channel blockers, beta blockers, anti-depressants and non-steroidal anti-inflammatory medications. Tr. at 91, 106, 244.

17. In September 1993, plaintiff was hospitalized for chronic refractory migraine. The attending physician, Dr. Don Seelinger, suggested a detoxification program to her treating physician, Dr. Swiderek. Tr. at 105. Similarly, Dr. Powers, a consulting neurologist, was "not optimistic about the situation" as it existed and also suggested inpatient treatment for detoxification. He stated that dependency on prescribed barbiturates and analgesics probably contributed to the persistence of the headaches as well as a "failure of attempts at treatment." Tr. at 108. Dr. Powers also suggested that his patient see an oral surgeon because of the possibility

of TMJ-related problems.  Tr. at 106.  Plaintiff went through a four-day detoxification program at Presbyterian Hospital in October 1993 under the care of Dr. Mitchell Simson, which she "tolerated . . . extremely well."  Tr. at 112.

    18.  Ms. Souther did see an oral surgeon, Dr. Daniel Clifford, in March 1994.[4]  Dr. Clifford diagnosed plaintiff with TMJ disorder and recommended the use of a neuromuscular orthotic appliance.[5]  Around the same time, plaintiff was also seen by a psychologist who recommended a cognitive and behavioral approach to treatment.  Tr. at 103.  However, plaintiff discontinued her association with the psychologist after a short time, although the reason is unclear.[6]

    19.  At some point, plaintiff started seeing Dr. Denise Aamodt at University Hospital for her headaches, who started her on a prophylactic regimen of medication.[7]  According to a treatment note from November 1994, plaintiff's headache frequency was reduced to one to two times weekly (instead of three to four).  Tr. at 202.  Another emergency room treatment note dated January 1995 states that plaintiff reported another decrease in frequency, to once every three months.  She reported her last headache as having occurred on November 30, 1994.  Tr. at

---

[4] One letter at Tr. 212, shows a date of March 3, 1993.  However, all other reports and letters in this exhibit, as well as references in the doctor's notes, show the date as March 1994.

[5] At the hearing, plaintiff stated that her financial condition prevented her from following up on this treatment.  Tr. at 289.

[6] Plaintiff had voiced some concern over the treatment being "too financially stressing."  Tr. at 103.

[7] The regimen included Tegretol, Elavil, Prozac and Fiorinal.  The treatment notes also shows that she had come to the emergency room with a migraine, for which she was given the usual dose of parenteral Demerol and Phenergan.

199.

20.     The change for the better appears to have been short-lived. In May 1995, Dr. Aamodt referred Ms. Souther to Dr. Shih, a neurologist.[8] Plaintiff reported a headache frequency of three to four times a week, with two to three "major headaches" requiring trips to the emergency room. Tr. at 242. Dr. Shih recommended treatment with a trial of "third line agents" with a gradual elimination of her narcotics medications. The most recent treatment documentation is a medical note by Dr. Aamodt on June 16, 1995, stating that plaintiff said "she is doing great on valproic acid." Tr. at 263.[9]

21.     The record is replete with documented visits to the emergency room where plaintiff presented in obvious distress with intractable headaches which were sometimes successfully treated with parenteral narcotics. Tr. at 105, 158, 163, 169, 178, 188, 195, 267.[10] Sometimes these visits provided only temporary relief. For example, Dr. Powers, to whom plaintiff was referred by her treating physician Dr. Swiderek, noted that intravenous administration of narcotic analgesics and anti-emetics in the emergency room allowed plaintiff to "sleep for a while," but did not eliminate the headache. Tr. at 106.

---

[8] This visit was made after the January 1995 administrative hearing but prior to the ALJ's decision.

[9] The fact that plaintiff may have finally obtained relief at this point does not affect findings for the period during which she alleged disability. Because plaintiff had engaged in substantial gainful activity until January 3, 1994, she could not be found disabled prior to that date. Tr. at 15. Similarly, the Commissioner may inquire into whether benefits should be continued past a certain time by conducting "continuing disability reviews" allowed in the regulations. 20 C.F.R. § 404.1589, 1590.

[10] On at least two of these visits, the medical notes refer to plaintiff as being "tearful," "weepy," or "in distress." Tr. at 105, 169.

22. Plaintiff's "subjective" evidence, on the other hand, can be evaluated only on the basis of credibility. Thompson v. Sullivan, 987 F.2d 1482, 1488-89 (10th Cir. 1993) (citing Luna v. Bowen, 834 F.2d 161, 162 (10th Cir. 1987). However, while the ALJ correctly cited the standard for a credibility analysis, Tr. at 17, the actual inquiry did not amount to much more than lip service.[11] The evidence on which he relied to conclude that plaintiff was not credible is not only woefully insufficient but in some regards actually works against his conclusion.

23. For example, the ALJ cited inconsistencies in plaintiff's reports of headache frequencies. An examination of various reports shows that the reports do vary from one to four headaches a week, but this depends on whether they include those that send her to the emergency room. Tr. at 76, 106, 189, 199, 212, 280. Also, plaintiff *did* report headaches only once or twice a month, but relative to pre-1992 frequency, which is not relevant to the insured period here. While it is true that plaintiff was able to work with the migraines she had for many years, Tr. at 18, she arrived at the point where her frequent absences placed her in jeopardy of being fired, and she quit work instead. Tr. at 294. Although plaintiff technically worked at Presbyterian until July 1994, the entire last year consisted of a medical leave of absence. Tr. at 211.

24. At the hearing, Ms. Souther stated that she spends about 10 to 12 hours a day in bed and eats her meals in bed, and is up and around only 3 to 5 hours per day. Tr. at 284-85, 290.

---

[11] Before a claimant's subjective complaints are discounted, the ALJ should consider various factors, such as: "the levels of medication and their effectiveness, the extensiveness of the attempts (medical or nonmedical) to obtain relief, the frequency of medical contacts, the nature of daily activities, subjective measures of credibility that are peculiarly within the judgment of the ALJ, the motivation of and relationship between the claimant and other witnesses, and the consistency or compatibility of nonmedical testimony with objective medical evidence." Thompson v. Sullivan, 987 F.2d 1482, 1489 (10th Cir. 1993) (quoted cases omitted); 20 C.F.R. §§ 404.1529 and 416.929.

She makes only small meals such as sandwiches for her little girl and usually watches her, although sometimes a sitter is called in to help. Tr. at 284-85. Plaintiff described her child as having gotten "pretty used" to staying with her mother in her darkened bedroom. Tr. at 288. Her husband does all the shopping, and she does the dishes about once a week and the laundry once a month. Id. She stated she can stand for about 45 minutes to an hour, can walk about one and a half miles if she has to, and is able to vary sitting and standing for only about 3 hours a day without having to lie down for a couple of hours. Tr. at 285-86, 287-88. The only exertional limits she reported was for lifting more than 15 pounds. Plaintiff said that she still sees Dr. Aamodt for follow-up visits twice a month, but still needs to go to the emergency room 3 to 4 times a month. Tr. at 278.

    25. The ALJ pointed to the fact that plaintiff "presumably" cares for her child and does "light cooking and cleaning" as evidence of daily activities supporting an ability to work as a secretary. Tr. at 18. More absurdly, he noted that her headaches "respond favorably" to "intravenous injections received at hospital emergency rooms" as evidence of plaintiff's obtaining relief from treatment. Tr. at 16, 18. In light of what plaintiff *actually* said at the hearing, the ALJ's conclusion that plaintiff is noncredible is not only *not* based on substantial evidence, but also mischaracterizes plaintiff's testimony.[12]

    26. The ALJ also completely disregarded the side effects of the various drugs plaintiff

---

[12] Perhaps in the spirit of collegiality as well as enlightenment, the ALJ in this case would benefit from a conversation with Administrative Law Judge Robert L. Schatz, who suffers from migraines and would be able to provide, I'm sure, a credible account of what a migraine attack feels like even before needing the services of an emergency room. See Valencia v. Chater, Civil No. 96-791 M/WWD, Proposed Findings and Recommendation, ¶ 19 entered October 15, 1997.

takes regularly. Tr. at 18.[13] He failed to take into account the rapid escalation of the frequency and severity of the headaches just before she found it necessary to quit work, the increase in medication dosage and frequency, and the concomitant increase in the medications' side effects. At the time of the hearing, plaintiff's medications included Tylenol with Codeine, Elavil and Fiorinal every day, and Demerol and Phenergan (for accompanying nausea) once or twice a week when the other medications failed to relieve the pain. She reported that these medications left her feeling continuously sleepy, fatigued and exhausted. Tr. at 278, 280, 285, 291.[14]

27. While Ms. Souther's testimony alone cannot establish disabling pain, the ALJ cannot discredit her testimony as to the disabling or limiting effects of her headache pain solely based on a lack of clinical or diagnostic findings, when that testimony is uncontradicted. See Sisco, 10 F.3d at 743. Except for the ALJ's own rather skewed interpretation of the clinical picture, plaintiff's testimony bears up alongside the medical findings. Thus, the ALJ's noncredibility determination was in error. See Diaz v. Sec. of Health & Hum. Serv., 898 F.2d 774, 777 (10th Cir. 1990) (quoted case omitted) (credibility determinations are not upset unless not supported by substantial evidence).

28. Because part of Ms. Souther's job as unit secretary at the OB/GYN clinic included

---

[13] He simply noted that there was no evidence of a diagnosis of chronic fatigue syndrome. However, in January 1994, plaintiff saw David Stryker, M.D. for complaints of fatigue. Although the doctor felt that her complaints were related more to "ennui than fatigue," his preliminary impression was that the symptoms could be associated with her hepatitis. Tr. at 912.

[14] If personal experience fails to serve here, one need only to refer to a Physician's Desk Reference for the listed side effects of these medications as a way to substantiate plaintiff's complaints of fatigue and tiredness, much less the synergistic effects of having all these medications on board at the same time on a continued basis.

transporting and some lifting of patients, the ALJ conceded that she could not perform the duties of her particular job, but that she could perform a secretarial job as described in the <u>Dictionary of Occupational Titles</u>, with a restriction on lifting more than 15 pounds. <u>Tr. at 18</u>. Given that the evidence for a noncredibility determination was insufficient, the medical findings together with plaintiff's testimony preclude a finding that Ms. Souther has the residual functional capacity to return to work as a secretary.

29. The existence of nonexertional impairments which diminish a plaintiff's residual functional capacity requires that a vocational expert ("VE") be consulted. <u>Cruse v. U.S. Dept. of Health & Hum. Serv.</u>, 49 F.3d 614, 619 (10th Cir. 1995). Here, in a Step Four inquiry, the scope of jobs is limited to those that qualify as the claimant's past relevant work. <u>Winfrey v. Chater</u>, 92 F.3d 1017 (10th Cir. 1996).[15]

30. In sum, I find (1) that the ALJ did not err in finding that even in combination, Ms. Souther's impairments did not render her disabled at Step Two; (2) that the ALJ's noncredibility determination as well as the finding that plaintiff can perform past relevant work as a receptionist and secretary was not based on substantial evidence; and (3) that the ALJ erred by not obtaining the testimony of a vocational expert in determining plaintiff's residual functional capacity for performing work as a secretary.

## Recommendation

I recommend that plaintiff's Motion to Reverse and Remand for a Rehearing [7-1] be

---

[15] Defendant is correct in maintaining that a VE is not required at Step Four. <u>Deft's Br. at 15</u>. However, residual functional capacity is considered at Step Four as well as Step Five such that the presence of nonexertional limitations would at times necessitate a vocational consultation. <u>Winfrey v. Chater</u>, 92 F.3d 1017, 1023 n.4 (10th Cir. 1996).

granted in order to conduct a proper credibility inquiry and a Step Four analysis, obtaining the services of a vocational expert to determine whether plaintiff has the residual functional capacity to perform the duties of secretary with lifting restrictions.

Timely objections to the foregoing may be made pursuant to 28 U.S.C. § 636(b)(1)(C).


_____
UNITED STATES MAGISTRATE JUDGE